# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |  |
|---|---|---|
| INNOVATIVE DISPLAY TECHNOLOGIES LLC, ET. AL., | ) ) ) ) | Civil Action No. 2:14-cv-201-JRG (CONSOLIDATED - Lead Case) |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| HYUNDAI MOTOR CO., ET AL., | ) ) |  |
| Defendants. | ) |  |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

Pursuant to P.R. 4-5(b) and the Court's Docket Control Order of February 20, 2015 (Docket No. 199), defendants Hyundai Motor Company, Hyundai Motor Manufacturing Alabama, LLC, Kia Motors Manufacturing Georgia, Inc., Kia Motors America, Inc., Kia Motors Corporation; Mercedes-Benz U.S. International, Inc. and Mercedes-Benz USA, LLC; Nissan Motor Co., Ltd. and Nissan North America, Inc.; Toyota Motor Corp., Toyota Motor Sales, U.S.A., Inc., Toyota Motor Manufacturing, Kentucky, Inc., Toyota Motor Manufacturing, Indiana, Inc., Toyota Motor Manufacturing, Texas, Inc., Toyota Motor Manufacturing, Mississippi, Inc., Subaru of Indiana Automotive, Inc., and Gulf States Toyota, Inc.; American Honda Motor Co., Inc., Honda of America Mfg., Inc., Honda Manufacturing of Alabama, LLC, and Honda Manufacturing of Indiana, LLC; Sprint Spectrum L.P., Sprint Solutions, Inc., Boost Mobile, LLC, and Virgin Mobile USA, L.P.; BMW of North America, LLC, and BMW Manufacturing Co., LLC; and Volkswagen Group of America, Inc. and Volkswagen Group of America Chattanooga Operations, LLC (collectively, "Defendants") hereby serve this Responsive Claim Construction Brief.

# Table of Contents

I.      Introduction ............................................................................................................ 1

II.     Asserted claims of the '194, '177, '370, '816, '660, '974, '563, and '956
        Patents are indefinite and invalid ......................................................................... 1

   A.   The Definiteness Requirement ........................................................................... 1

      1.   The Legal Standard for Indefiniteness ........................................................... 1

      2.   Terms of Degree are Indefinite if the Specification is Deficient .................... 2

      3.   Expert Testimony in this Context ................................................................... 3

   B.   Indefinite Terms ................................................................................................ 3

      1.   "pass through a liquid crystal display with low loss" ...................................... 3

      2.   "optical elements" ......................................................................................... 6

      3.   "well defined optical elements or deformities" and "optical elements
           or deformities of well defined shape" ............................................................ 8

      4.   "in close proximity" ....................................................................................... 10

      5.   "facilitate better mixing of light rays within the cavity or recess" ................. 12

      6.   "more in the width direction" ......................................................................... 13

      7.   "positioned near" or "positioned near the light emitting surface…and
           air gap between" or "positioning a film near" ................................................ 14

      8.   "edge of said panel assembly" ....................................................................... 16

      9.   "one or more light emitting diodes along said light input surface for
           receiving light from said light emitting diodes and conducting the light
           from said edge for emission of the light from at least one of said sides."
           ....................................................................................................................... 17

      10.  "output distribution defined by a greater width component than
           height component" ......................................................................................... 19

III.    Claim Terms In Dispute ........................................................................................ 20

   A.   Terms to Construe ............................................................................................. 20

      1.   "continuous side walls" ................................................................................. 20

      2.   "transition region" ......................................................................................... 22

      3.   "an air gap between the film, sheet, plate or substrate and the panel
           member" ......................................................................................................... 24

      4.   "one or more secondary flat, angled, faceted or curved reflective or
           refractive surfaces" ....................................................................................... 26

      5.   "predetermined" ............................................................................................ 28

      6.   "for shining light through said panel member" ............................................... 29

IV.     Conclusion ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdou v. Alphatec Spine, Inc.*,
   No. 12–CV–1804 BEN (RBB), 2014 WL 6611422 (S.D. Cal. Nov. 19, 2014) ....................11

*Acco Brands, Inc. v. Micro Security Devices, Inc.*
   346 F.3d 1075 (Fed. Cir. 2003)...................................................................................30

*Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*,
   No. 6:11-cv-00391-LED, 2012 WL 2872121  (E.D. Tex. July 12, 2012)...........................3, 15

*Aquatic AV, Inc. v. Magnadyne Corp.*,
   No. C 14-01931 WHA, 2015 U.S. Dist. LEXIS 22925 (N.D. Cal. Feb. 25,
   2015) ........................................................................................................................15

*Bell Atlantic Network Serv's, Inc. v. Covad Comm's Grp., Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001)...................................................................................27

*Bicon, Inc. v. Staumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)..................................................................................4, 8

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)...............................................................................17, 18

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)..................................................................................2, 5

*Diamond Coating Techs., LLC v. Hyundai Motor Am.*,
   2014 WL 5698445 (C.D. Cal. Aug. 25, 2014)..............................................................14

*Endo Pharms. Inc. v. Watson Labs., Inc.*,
   No. 2:13-cv-192, 2014 U.S. Dist. LEXIS 84804 (E.D. Tex. June 23, 2014)
   (Gilstrap, J.) .........................................................................................................3, 5, 9

*Fairfield Indus., Inc. v. Wireless Seismic Inc.*,
   14-cv-2972, 2015 WL 1034275 (S.D. Tex. Mar. 10, 2015) ..................................................12

*Halliburton Energy v, M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)................................................................................9, 15

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008)................................................................................7, 16

*Hoffer v. Microsoft Corp.*,

- iii -

405 F.3d 1326 (Fed. Cir. 2005)................................................................................5

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
341 F.3d 1332 (Fed. Cir. 2003)...............................................................................9

*Interval Licensing LLC v. AOL, Inc.,*
766 F.3d 1364 (Fed. Cir. 2014)....................................................................... *passim*

*Largan Precision Co., Ltd. v. Genius Elec. Optical Co.,*
No. 13-cv-02502, 2014 WL 5358426 (N.D. Cal. Oct. 20, 2014) ...........................12

*MediaTek, Inc. v. Sanyo Electric Co.,*
513 F. Supp. 2d 778 (E.D. Tex. 2007).....................................................................9

*Mobile Telecomc'ns Techns., LLC v. Samsung Telecommc'ns Am., LLC,*
C.A. No. 2:13-259-RSP, 2014 WL 6997767 (E.D. Tex. Dec. 11, 2014) ...............24

*Mobile Telecomms. Techs., LLC v. Amazon.com, Inc.,*
No. 2:13-CV-883, 2014 WL 5766050 (E.D. Tex. Nov. 5, 2014) ............................2

*Morton Int'l, Inc. v. Cardinal Chem. Co,*
5 F.3d 1464 (Fed. Cir. 1993).....................................................................................2

*Nautilus, Inc. v. Biosig Instr.,*
134 S.Ct. 2120 (2014).................................................................................... *passim*

*Novo Indus., L.P. v. Micro Molds Corp.,*
350 F.3d 1348 (Fed. Cir. 2003)........................................................................16, 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
521 F.3d 1351 (Fed. Cir. 2008)........................................................................22, 28

*Omega Eng'g Inc. v Raytek Corp.,*
334 F.3d 1314 (Fed. Cir. 2003)........................................................................25, 26

*Prolifiq Software Inc. v. Veeva Sys. Inc.,*
2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ..........................................................3

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.,*
753 F.3d 1291 (Fed. Cir. 2014).............................................................................18

*Steel Wheel Corp. v. B.F. Goodrich Rubber Co.,*
27 F.2d 427 (E.D. Mich. 1928)................................................................................6

*Synqor, Inc. v. Artesyn Techs., Inc.,*
No. 2:07-cv-497-TJW-CE, 2010 WL 2991037 (E.D. Tex. July 26, 2010) .......18, 19

*Teva Pharms USA, Inc. v. Sandoz, Inc.,*

135 S.Ct. 831 (2015)..........................................................................................................................3

*Texas Instruments, Inc. v. Linear Techs. Corp.*,
    182 F. Supp. 2d 580 (E.D. Tex. 2002)........................................................................................22

*Textron Innovations Inc. v. Amer. Eurocopter Corp.*,
    498 Fed. App'x 23 (Fed. Cir. 2012)............................................................................................23

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (Fed.Cir. 2001).......................................................................................................2

**Statutes**

35 U.S.C. § 112 ¶ 2..........................................................................................................................1

## I.    INTRODUCTION

Plaintiffs have asserted the so-called Display Patents and Auto Patents against a broad swath of companies in equally broad industries in various venues around the country. Defendants here, with the exception of Sprint, are automobile manufacturers. Many of the asserted patent claims use terminology that fails to put the public on notice as to what is and is not covered by the asserted patent monopoly, making them invalid. Patentee often chose terms of degree for which the patents provide absolutely no standard by which they could be judged, and, in others, used another term that requires a similarly standardless, subjective assessment. These claims fail in view of *Nautilus, Inc. v. Biosig Instr.*, 134 S.Ct. 2120 (2014).

As to the terms that can and should be construed, Plaintiff seeks to avoid clarifying the terms or committing to an interpretation of their scope, advocating no construction or relying on a construction from a previous case not involving Defendants. For example, Plaintiffs repeatedly ask the Court to instruct the jury that terms have their "plain and ordinary meaning"—without saying what that plain and ordinary meaning is, even though Plaintiffs' infringement contentions read the terms in ways contrary to their common sense meanings and the intrinsic evidence.

For the reasons discussed below, Defendants respectfully request that the Court find certain asserted claims of the patents indefinite and invalid, and that the Court adopt Defendants' proposed constructions of the disputed claim terms.

## II.    ASSERTED CLAIMS OF THE '194, '177, '370, '816, '660, '974, '563, AND '956 PATENTS ARE INDEFINITE AND INVALID

### A.    The Definiteness Requirement

#### 1.    The Legal Standard for Indefiniteness

35 U.S.C. § 112 ¶ 2 requires patent claims to be definite: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject

matter which the applicant regards as his invention." Definiteness "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus,* 134 S.Ct. at 2129. A claim must be clear enough in its legal scope to allow one  skilled in the art to determine whether or not a particular product or method infringes. *Morton Int'l, Inc. v. Cardinal Chem. Co,* 5 F.3d 1464, 1470 (Fed. Cir. 1993). While "absolute precision" is not required in the claim language,

> [t]o tolerate imprecision just short of that rendering a claim "insolubly ambiguous" would diminish the definiteness requirement's public notice function and foster the innovation-discouraging "zone of uncertainty"…against which this Court has warned.

*Nautilus*, 134 S.Ct. at 2130. "The definiteness inquiry is concerned with whether the bounds of the invention are sufficiently demarcated, not with whether one of ordinary skill in the art may find a way to practice the invention," *Mobile Telecomms. Techs., LLC v. Amazon.com, Inc.*, No. 2:13-CV-883, 2014 WL 5766050, *19 (E.D. Tex. Nov. 5, 2014) (quoting *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519 (Fed. Cir. 2013)), and is satisfied only when the claims "clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citing *United Carbon v. Binney & Smith Co.,* 317 U.S. 228, at 236 (1942)). When a term is not explained in the written description and could have other meanings to a person of ordinary skill in the art, the term is indefinite. *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed.Cir. 2001).

### 2.    Terms of Degree are Indefinite if the Specification is Deficient

In an indefiniteness analysis, "[w]hen a word of degree is used, the district court must determine whether the patent's specification provides some standard for measuring that degree." *Datamize*, 417 F.3d at 1351; *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370–71 (Fed.

Cir. 2014); *see also Endo Pharms. Inc. v. Watson Labs., Inc.*, No. 2:13-cv-192, 2014 U.S. Dist. LEXIS 84804, at *24 (E.D. Tex. June 23, 2014) (Gilstrap, J.) (recognizing that the Federal Circuit has required "an 'objective anchor' that identifies the bounds of the claim"). For example, the Court held a claim indefinite because the terms "highly modulated" and "smooth bumps" had no objective anchor or standard for measuring "smoothness" or the difference between a modulated and a highly modulated surface. *Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, No. 6:11-cv-00391-LED, 2012 WL 2872121, *12, at *14-15 (E.D. Tex. July 12, 2012). Furthermore, an alleged purpose of the invention can only provide guidance if the term in question is tied to the alleged purpose. *Id*. at *14-15 ("While ADT identifies alleged purposes of the invention, nothing in the specification ties the "smoothness" of the bumps to "minimizing" of backscatter or the "increasing" of optical efficiency….").

### 3. Expert Testimony in this Context

For indefiniteness, expert testimony can be used "to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 840–41 (2015). But if claim terms are "used in their ordinary meaning," *id.* at 837–38, 840–41 (citation omitted), and if the court must decide "whether the claim term in light of the intrinsic record provides a subjective as opposed to objective standard for determining the scope of the invention," then indefiniteness is a question of law based solely on the intrinsic evidence. *Prolifiq Software Inc. v. Veeva Sys. Inc.*, 2014 WL 3870016, at *8 n.6 (N.D. Cal. Aug. 6, 2014); *Interval Licensing*, 766 F.3d at 1371 n.6.

### B. Indefinite Terms

### 1. "pass through a liquid crystal display with low loss"

Plaintiffs argue that the phrase "pass through a liquid crystal display with low loss" does not limit the claims. But Plaintiffs' own expert, Mr. Werner, testified that the term should be

accorded its "plain meaning." Ex. 1, Decl. of Ken Werner, March 4, 2015 ("Werner Decl."), ¶ 8;

Ex. 2, Dep. Tr. of Ken Werner, March 9, 2015 ("Werner Dep."), at 25:14-26:10 (term "certainly

has meaning").[1] Thus, both experts agree that the phrase "pass through a liquid crystal display

with low loss" limits the claims in which it appears. The term "low loss," however, fails to define

the scope of the claims with reasonable certainty. For the reasons further discussed below, and

set forth in the declaration of Mr. Smith-Gillespie, and his concomitant testimony, the Court

should find this term indefinite and the claims in which it appears invalid.

### a.        "Low Loss" Must Limit the Claims

Plaintiffs' contention that "low loss" does not limit the claims is contrary to law.[2] First,

the phrase is not analogous to a "whereby" clause of a process claim that may simply be ignored.

The phrase describes the function of "the well defined optical elements or deformities" (*see* Ex. 3

Gillespie Decl., ¶144) in a manner that purports to limit the structure of the optical elements or

deformities—i.e., the structure must be "well defined" to "control light" in a manner that results

in "low loss." Ex. 4, '194 Patent, claim 1. It does not merely restate the necessary result of the

asserted claims, and "it certainly has meaning." *See* Ex. 2, Werner Dep., at 26:6-10.

Second, patent claim terms must be construed to give every word meaning, rendering no

words superfluous. *See Bicon, Inc. v. Staumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006). The

"low loss" limitation is not mere surplusage because the patentee deliberately added it during

prosecution specifically to secure allowance. *See* Ex. 5, at IDT0000747-761. Even if "low loss"

were a "whereby" clause (which it is not), it cannot be ignored because it "states a condition that

---

[1] Defendants' expert, Robert Smith-Gillespie, similarly opines that the term "low loss" limits the claims. Ex. 3, Decl. of Robert Smith-Gillespie, March 4, 2015 ("Gillespie Decl."), ¶144.

[2] In the *Acer* case, Plaintiffs proffered a "plain meaning" argument similar to their expert in this case. *Sua sponte*, Magistrate Judge Payne held that the term did not limit the claims. Ex. 6, *IDT v. Acer, Inc. et al. ("Acer")*, 2:13-cv-522, D.I. 101 (Aug. 26, 2014), at 54.  Magistrate Judge Payne did not have the benefit of the opinion of one skilled in the art when deciding whether the term "low loss" limited the claims in which it appears.

is material to patentability." *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329-30 (Fed. Cir. 2005). Thus, the "low loss" phrase limits the claims and cannot be ignored as a limitation.

### b.   "Low Loss" is Indefinite

The disputed term "pass through a liquid crystal display with low loss" and particularly the use of "***low*** loss" renders the claim indefinite because no objective basis is provided by which the public can judge the metes and bounds of the claims. *See Datamize,* 417 F.3d at 1347. "***Low*** loss" is a term of degree, and the patent's specification must therefore "provide some standard for measuring that degree." *Datamize.* 417 F.3d at 1351 (quotation omitted); *see also Endo Pharms.*, 2014 U.S. Dist. LEXIS 84804, at *24.

Here, the patent specification provides no standard or public notice as to what would constitute "**low** loss" versus, e.g., **moderate** or **high** loss.[3] Nor does the specification provide any standard for measuring loss, and there were no industry wide standards for quantifying loss in 1995. Ex. 3, Gillespie Decl., ¶149. And, the specification never describes a "film, sheet or substrate" achieving "low loss," as required by the claims of the '370 Patent. *Id.* at ¶150.

The only two passages even referring to "low loss" shed no light on the issue of when loss is "low" versus any other degree of loss. Ex. 4, '194 Patent, at 5:25-32; Ex. 7, '370 Patent, at 5:17-23; *see* Ex. 3, Gillespie Decl., ¶¶146, 148. Those passages merely mimic the claim language and, at most, add that the light output will be "more efficient" if the light rays are emitted at "predetermined angles." Ex. 3, Gillespie Decl., ¶148. The specification does not link such "efficiency" to "low loss," and "more efficient" only adds ambiguity because it is also a term of degree without metes or bounds. *Id.* Thus, the sole passage in the specification relied upon by Plaintiffs fails to provide any clarity to the phrase and instead adds further confusion.

---

[3] The prosecution histories of the '370 and '194 Patents likewise provide no guidance as to the meaning of "low loss."

Plaintiffs' expert Mr. Werner only compounds the confusion when he opines that "low loss" should be accorded its "plain meaning."   Mr. Werner testified that the plain meaning of "low loss" is "that the amount of light passing through the liquid crystal display is a relatively high percentage of the incoming light relative to other technology alternatives." Ex. 2, Werner Dep., at 26:14-17.   Notably, Mr. Werner admits this subjective comparison is not supported in the specification and undoubtedly varies based on (i) which "alternative" is used, (ii) when the comparison is made, and (iii) whether a current or prior alternative is used. *See, e.g.*, *id*. at 35:20-37:22. Thus, absent any standard in the specification, one of ordinary skill in the art could not provide an objective basis by which the public can determine the metes and bounds of "low loss." Instead, Mr. Werner offered similarly ambiguous and wholly unsupported opinions: "Low loss would be well understood by professionals in the field to mean the low loss that is now typically seen in modern displays relative to what it was before." *Id.* at 28:5-8.[4]   But Mr. Werner could not articulate one skilled in the art's understanding of "low loss" in June 1995, stating that he would need to reference technical articles and patents, none of which were referenced in providing his opinion on "low loss." *Id*. at 28:9-30:2.   Mr. Werner's testimony is in line with the opinion of Mr. Smith-Gillespie that the specifications do not provide any guidance about what qualifies as "low loss," or conversely, what amount of loss that would not be considered "low loss." Ex. 3, Gillespie Decl., ¶146.

The term "low loss," viewed in light of the specifications, fails to inform those skilled in the art of the scope of the claims with reasonable certainty, as required by *Nautilus*.

### 2.   "optical elements"

---

[4] This further highlights the indefiniteness of the term.  *Cf. Steel Wheel Corp. v. B.F. Goodrich Rubber Co.*, 27 F.2d 427 (E.D. Mich. 1928), *aff'd* 42 F.2d 406 (6th Cir. 1930) (claims using the term "modified from standard practice" were indefinite because the patents failed to define "standard practice").

Claims 1, 16, and 31 of the '194 Patent and claims 13 and 47 of the '370 Patent recite both "optical elements" and "deformities." These two terms are presumed to have different meanings because they appear in the same claim. *See, e.g.*, *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("partially hidden from view" versus "generally hidden from view"). Yet, nothing in claims 1, 16, and 31 of the '194 Patent or claims 13 and 47 of the '370 Patent, or anywhere in the '194 or '370 Patents, gives any guidance as to what "optical elements" are and how "optical elements" and "deformities" are different. *See* Ex. 2, Werner Dep., at 50:18-22 ("To the best of my knowledge, [optical elements] is not defined [in the specification of the '194 and '370 Patents] . . ."). Without any discussion of "optical elements" or how "optical elements" differ from "deformities," a person of ordinary skill in the art could not determine the scope of the claims with reasonable certainty.

In the '194 and '370 Patents, the term "optical elements" is only used in the claims, and in the case of the '194 Patent, in the Abstract, but only to repeat the claim language. *See* Ex. 3, Gillespie Decl., ¶¶155-156. Although the term "element" is used twice in the specification for the '194 and '370 Patents, it is used in a discussion of deformities ("… desirably 0.006 square inch per deformity/*element* or less," and "… thereby eliminating the detection of gradient or banding lines that are common to light extracting patterns utilizing larger *elements*."). Ex. 4, '194 Patent, at 5:43-50 (emphases added).  This conflation of deformity and element adds further confusion, particularly where the conjunction "or" is used in the claims to distinguish the terms "deformities" from "optical elements." Moreover, there is no evidence in the specification or prosecution history that ties the "deformity/element" reference to the claimed "optical elements," let alone serve as "shorthand for the claim term 'optical elements'" as claimed by Mr. Werner. Ex. 3, Werner Decl., ¶10. Thus, with an explicit definition provided for deformities (*see* Ex. 4, '194 Patent, at 4:44-48), and absolutely no guidance on "optical elements," the specification fails to inform one of ordinary skill in the art as to the scope of "optical elements."

Not even Plaintiffs' expert can distinguish between "optical elements" and "deformities," opining that the terms mean the same thing. Ex. 2, Werner Dep., at 51:20-52:2. But that cannot be correct in the context of these claims and these patents, and is inconsistent with Federal Circuit precedent holding different terms are presumed to have different meanings. The claims recite "optical elements **or** deformities." Ex. 4, '194 Patent, at claim 1 (emphasis added). The use of the disjunctive "or" highlights—even as a matter of grammar—that optical elements must be different from deformities, just as patentee used the disjunctive "or" to relate two disparate elements, such as "reflective **or** refractive surfaces." '194 Patent, at claim 1 (emphasis added).

Because the specification fails to provide any guidance for "optical elements," one of ordinary skill in the art would not be able to determine the scope of the claims, and the Court should find the phrase indefinite.

### 3. "well defined optical elements or deformities" and "optical elements or deformities of well defined shape"

"Well defined optical elements or deformities" is an indefinite term of degree. The term "well defined" only appears in the claims and in the Abstract, parroting the claims, of the '194 Patent. While the specification and figures 4a-4d provide examples of **deformities** on the panel member (*i.e.*, "dots, squares, diamonds, ellipses, stars, random shapes, and the like," and "prismatic surfaces, depressions or raised surfaces of various shapes." Ex. 4, '194 Patent, at 5:43-52; 5:67-6:17), and how **deformities** may be produced ("molded, etched, stamped, thermoformed, hot stamped or the like into or on one or more areas of the panel member," *id.*), the specification never distinguishes between "**deformities**" and "**well defined deformities**." *See* Gillespie Decl., ¶¶168-171. Patent terms are to be construed so as to give every word meaning, with no words rendered superfluous. *Bicon Inc.*, 441 F.3d at 950-51. Any proper construction must give meaning to "well defined" in its construction of the overall claim term.

- 8 -

Where, as here, the intrinsic record has no meaningful references to a claim term, it cannot be relied on to resolve any ambiguity in the term. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003). The claims incorporating this term are indefinite because there is no "objective anchor" that identifies the bounds of the claim. *Endo Pharms.*, 2014 U.S. Dist. LEXIS 84804, at *24.

Furthermore, even if a claim term's definition can be reduced to words, the claim is still indefinite if a person skilled in the art cannot translate the definition into meaningfully precise claim scope. *Halliburton Energy v. M-I LLC*, 514 F.3d 1244, 1250-51 (Fed. Cir. 2008). Plaintiffs' construction of "well defined" to mean "distinct" does not precisely define the claim scope. Based on the specification of the '194 Patent, a person of ordinary skill in the art at the time of the alleged invention would have no sure way of delineating between films that have optical elements or deformities that are "distinct" or of a "distinct shape," and those that do not contain "distinct" features. There is no support in the intrinsic record for construing well-defined as "distinct." *See* Ex. 3, Gillespie Decl., ¶172.

The construction of "well defined" as "distinct" will not help the jury, because "distinct" is just as ambiguous as "well defined," and again lacks support in the specification. *MediaTek, Inc. v. Sanyo Electric Co.*, 513 F. Supp. 2d 778, 791 (E.D. Tex. 2007) (rejecting ambiguous proposed construction). The bounds of what is or is not a "well defined" or "distinct" optical element or deformity are simply not sufficiently demarcated.

Mr. Werner confuses the issue further because he identifies the specification's discussion of "deformities" as examples of "well defined deformities."  Ex.1, Werner Decl., ¶7. But, he could not differentiate a "well defined" or even "distinct" deformity from just a "deformity," and conceded that such differentiation is not in the '194 Patent. Ex. 2, Werner Dep., at 48:3-11.

### 4. "in close proximity"

Claim 7 of the '177 Patent (Ex. 8) requires that each light source of a light emitting panel assembly be positioned "in close proximity" to a group of "the refractive or reflective surfaces." The term "in close proximity" is indefinite because the '177 Patent fails to provide any "objective boundaries" by which this term of degree can be measured. *Interval Licensing,* 766 F.3d at 1371.

The intrinsic record provides no guidance as to when a light source is "in close proximity" to "a group of the refractive or reflective surfaces."   Indeed, the phrase "in close proximity" appears nowhere in the '177 Patent (outside of claims 5 and 7) or even in U.S. Patent Application No. 08/495,176 (Ex. 9), the earliest application to which the '177 Patent claims priority.   Only one figure in the patent depicts "the reflective or refractive surfaces," but Plaintiffs' expert testified that those surfaces (Element 38 in Fig. 6 below) are **not** "in close proximity" to the light sources (Element 3).  Ex. 2, Werner Dep., at 84:18-19.[5]



The extrinsic record further indicates that "in close proximity" is indefinite.   As Mr. Smith-Gillespie opined, a person of skill in the art would not have understood the scope of "in close proximity."[6] Ex. 3, Gillespie Decl., ¶203. Mr. Werner testified that he could not place any

---

[5] The antecedent basis for "a group of *the* refractive or reflective surfaces" is found in claim 1: "one or more secondary flat, angled, faceted, or curved reflective or refractive surfaces."   The '177 Patent identifies these "refractive or reflective surfaces" as item 38 in figure 6.  Ex. 8, '177 patent, 7:3-12.

[6] Plaintiffs incorrectly assert that Mr. Smith-Gillespie testified that he understands the meaning of "in close proximity."   (IDT Br., at 13 n.66.)  In reality, Mr. Smith-Gillespie testified that "in close proximity" has different

boundaries on "in close proximity" because it is "a comparative judgment" and "no specific measurement applies."  Ex. 2, Werner Dep., at 88:5-12.  Mr. Werner further testified that the meaning of "in close proximity" actually changes from device-to-device depending on "the context of the overall structure."  *Id.* at 89:4-9.  In fact, Mr. Werner stated that he was unable to determine whether even the figures of the '177 Patent itself depicted elements that were "in close proximity" to each other because the task was too "abstract."  *Id.* at 89:10-19.

Plaintiffs argue that a person of ordinary skill in the art would have "a common sense understanding" of the term "in close proximity."  IDT Br., D.I. 216, at 13.  Like their expert, however, Plaintiffs cannot articulate the boundaries of this "common sense" understanding. Instead, Plaintiffs offer Element 37 of Figure 6 as one example of a reflective surface that is "in close proximity" to a light source. But, Plaintiffs' example is entirely irrelevant to the analysis because (i) Element 37 is not a group of "*secondary* . . . reflective or refractive surfaces" as required by claim 7, and (ii) the '177 Patent does not disclose that Element 37 is "in close proximity" to anything, including the light sources of Figure 6.  Even if Element 37 was an example of a "secondary surface" (which it is not) and even if the patent stated that Element 37 is "in close proximity" to a light source (which it does not), such an example would be insufficient to adequately disclose the full scope of the term.  *See, e.g., Interval Licensing*, 766 F.3d at 1373–74 (providing an example is not enough to define boundaries of claim term); *Abdou v. Alphatec Spine, Inc.*, No. 12–CV–1804 BEN (RBB), 2014 WL 6611422, at *7–10 (S.D. Cal. Nov. 19, 2014) (holding that "the absence of identified boundaries in terms of proximity,

---

possible meanings and therefore it is necessary to provide context to define the scope of the term.  Indeed, Mr. Smith-Gillespie repeatedly testified that "[w]ithout some sort of context, you can't tell what close proximity is."  Ex. 26, Gillespie Dep., at 82:19-20.

distance, or location renders the claims indefinite" under *Nautilus*).[7]

### 5. "facilitate better mixing of light rays within the cavity or recess"

Claim 15 of the '177 Patent requires using a "secondary . . . reflective or refractive surface *to facilitate better mixing* of light rays." This phrase is indefinite. The '177 Patent refers to "better mixing" only once, without explanation (Ex. 8, '177 Patent, at 8:12-16), to note *light sources* (not "secondary surfaces") can be positioned to achieve "better mixing of the light rays." No standards, thresholds, or examples are provided to identify "better mixing." Absent any intrinsic evidence defining the objective boundaries of "better mixing," this case stands "apart from patents that have overcome indefiniteness challenges to terms of degree." *Fairfield Indus., Inc. v. Wireless Seismic Inc.*, 14-cv-2972, 2015 WL 1034275, at *15 (S.D. Tex. Mar. 10, 2015).

The extrinsic record confirms the indefiniteness of "better mixing." Mr. Smith-Gillespie, for example, has explained that a person of ordinary skill in the art "would not understand how to compare the quality of the mixing of light rays to decide which mixing is 'better.'" Ex. 3, Gillespie Decl., ¶203. Mr. Werner similarly indicated that it is impossible to identify a threshold for "better mixing." Ex. 2, Werner Dep., at 79:18-80:1 (there is "no specific number" that indicates "better mixing."). Rather, he believes that "better mixing" is a "relative" concept that varies from device-to-device. *Id.* Mr. Werner testified that to determine the existence of "better mixing" for any particular device, a hypothetical comparison is necessary. *Id.* at 80:2-18. Specifically, a device containing "secondary . . . surfaces" must be compared to a hypothetical version of that same device that lacks the secondary surfaces. *Id.* at 80:2-18. If the real device is

---

[7] On page 13 of its brief, Plaintiffs cite *Largan Precision Co., Ltd. v. Genius Elec. Optical Co.*, No. 13-cv-02502, 2014 WL 5358426, at *7-8 (N.D. Cal. Oct. 20, 2014) for the proposition that the term "in close proximity" recently survived an indefiniteness challenge "without any boundaries of the term being set forth in the specification." To the contrary, *Largan Precision* addressed the meaning of the terms "convex" and "concave" (*not* the term "in close proximity"). *Id.* at *5-8. The court held that "convex" and "concave" were definite based on disclosures in the specification and evidence of industry convention. *Id.* at *6, *8. Plaintiffs have not (and cannot) point to any similar evidence in this case.

theorized to have a more uniform luminance than its fictional counterpart, "better mixing" has

occurred.  *Id.*  Mr. Werner's relative, constantly-shifting, and totally fictional "test" for "better

mixing" finds no support in the intrinsic record and serves to highlight the absence of any

objective boundaries for that claim term.[8]

### 6. "more in the width direction"

Claim 1 of the '816 Patent (Ex. 10) requires a "light input edge" that "has a refractive

surface that redirects the light output distribution of the light source *more in the width direction*

as the light enters the panel member." This limitation is indefinite. Plaintiffs' discussion of this

term focuses almost entirely on identifying the "width"  dimension of the light source.  But

Defendants, Mr. Smith-Gillespie, and Mr. Werner all agree that the width of the light source is

irrelevant for claim 1 of the '816 Patent.[9] What is relevant and clear is that it is the structure of

the input edge that must cause light to be redirected "more in the width direction."  Mr. Werner

agrees. *See* Ex. 2, Werner Dep., at 56:6-58:7. The problem, however, is that one of ordinary skill

in the art could not determine with reasonable certainty the various refractive input edge

structures that fall within the scope of the claim that redirect light "more in the width direction."

A person of ordinary skill in the art would not know whether and when the refractive

input edge redirects light "*more* in the width direction" because the claim is missing a

comparator. As Mr. Smith-Gillespie has explained, there are at least three reasonable

interpretations of this phrase to a person of skill in the art: (i) light is redirected "more in the

width direction" than the light was otherwise traveling after exiting the light source; (ii) light is

---

[8] Notably, while Plaintiff and its expert now advocate this fictional comparison to determine whether a secondary surface facilitates "better mixing," Plaintiffs did not conduct this recently-devised analysis before accusing Defendants' products of infringement.

[9] Regardless, a person of ordinary skill in the art would not know with reasonable certainty which direction constitutes the "width direction" because the '816 Patent never identifies the "width" direction and fails to provide any description of redirecting light in a "width" direction. Ex. 3, Gillespie Decl., ¶176.

redirected "more in the width direction" than in the height direction; or (iii) light is redirected "more in the width direction" than in the length direction. Because there is **no disclosure** concerning this limitation, it is impossible for a person of skill in the art to select among these equally reasonable alternative meanings.  *See, e.g.*, *Diamond Coating Techs., LLC v. Hyundai Motor Am.,* 2014 WL 5698445, at *4 (C.D. Cal. Aug. 25, 2014) (holding that if there are "multiple equally plausible but materially dissimilar constructions of a claim term, the claim would fail the 'reasonable certainty' standard").

Plaintiffs summarily argue that the "'more' comparison is made between the 'width' dimension and the other dimension(s) in which the light is refracted by the input edge." IDT Br., at 22. Although this may be yet another possible meaning of "more in the width direction," Plaintiffs offer no explanation or evidence as to why the other equally reasonable interpretations would be ruled out by a person of skill in the art trying to determine the scope of the claim to a reasonable certainty. And, if the comparison is between the "width" and all "other directions," Plaintiffs can offer no evidence to explain where the line would be drawn between a light ray travelling in the "width" direction and in the "other dimensions." Indeed, Mr. Werner admitted that the '816 Patent does not explain how one would determine which input edge structures would redirect light more in the width direction. Ex. 2, Werner Dep., at 61:14-18.  Thus, "the other dimension(s) in which the light is refracted by the input edge," is equally vague and not helpful for understanding the scope of claim 1.

### 7. "positioned near" or "positioned near the light emitting surface…and air gap between" or "positioning a film near"

Claims 1 and 23 of the '194 Patent (Ex. 4)  and claims 1, 3 5, 7, and 13 of the '974 Patent (Ex. 11) require that certain elements be "positioned near" each other.  Plaintiffs incorrectly argue that this term is not indefinite because those skilled in the art would understand "its plain

meaning without any guidance from the specification." IDT Br., at 14–15. As a term of degree, however, the patents must provide "objective boundaries" as to what constitutes "near" in the context of the patents. *Interval Licensing*, 766 F.3d at 1370–71. Neither the surrounding claim language, nor the specifications (where "near" only appears in the Abstracts), provide such objective boundaries or any explanation of what constitutes "near" in this context.

Contrary to Plaintiffs' discussion of Figs. 1-3, 5, and 15 and elements allegedly "positioned near" each other (IDT Br., at 14–15), the patents do not disclose whether these figures, or any of the other illustrated configurations of lighting assemblies (*see* Figs. 6–14), show a sheet/film/substrate that is "near" a panel member or an LED light source that is "near" a light entrance surface. Mr. Werner's definition of "near" as "close to rather than far away" (*see* Ex. 2, Werner Dep., at 83:6-19, 127:17-128:1) retains the equally subjective language "close" and "far." *See Halliburton*, 514 F.3d at 1251, 1253–56; *Advanced Display*, 2012 WL 2872121, at *14. Although Mr. Werner testified that the meaning of "near" could be determined separately for each lighting assembly (Ex. 2, Werner Dep. at 127:17-128:3, 128:12-17, 129:17-130:1, 131:4-10, 88:1-89:9), he admitted that there was "a foggy region," even for the specific examples in the patents, where it would be unclear whether the claimed structures were "near" each other. *Id.* at 128:18-129:1, 129:14-15, 129:17-130:8, 131:4-132:3, 132:133:8; *see also id.* at 89:10-89:19. This testimony merely confirms that "positioned near" falls within the "zone of uncertainty" identified in *Nautilus* and therefore the claim terms are indefinite. *See, e.g., Aquatic AV, Inc. v. Magnadyne Corp.*, No. C 14-01931 WHA, 2015 U.S. Dist. LEXIS 22925, at *3–10 (N.D. Cal. Feb. 25, 2015) (claim term indefinite when the "patentee's own expert stated . . . that 'waterproof' had 'different meanings depending upon the application'"); *Halliburton*, 514 F.3d at 1254–55 ("When a proposed construction requires that an artisan make a separate

infringement determination for every set of circumstances in which the composition may be used, and when such determinations are likely to result in differing outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite.").

### 8. "edge of said panel assembly"

Each independent claim of the '563 Patent requires both a "panel assembly" and a "panel member."  Further, according to the claims, the "panel assembly" has a "light input surface" that "receiv[es] light . . . and direct[s] the light through said panel assembly from an *edge of said panel assembly* for emission of the light from . . . *[a] surface of said panel member* . . . ."  Ex. 12, '563 Patent, at claim 1 (emphasis added).  Thus, the claims require that the panel assembly receive light and direct the light from an edge of the panel assembly to a surface of the panel member.  Neither the claims nor the specification describes **an edge** of a *panel assembly* or explains how light that is received by this undefined edge is then emitted from **a surface** of the *panel member*.  *See* Ex. 3, Gillespie Decl., ¶¶213-19. Because the scope of the claims cannot be understood with reasonable certainty, the claims of the '563 patent are invalid.  *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357-58 (Fed. Cir. 2003).

One possible interpretation of the claims is that the "edge" of the *panel assembly* is equivalent to the "edge" of the *panel member*.  But *panel assembly* and *panel member* are used in the claims and the specification to refer to separate, distinct structures.  *See, e.g.*, Ex. 12, '563 Patent, at 8:30-44. These terms, therefore, are presumed to have different meanings. *See, e.g.*, *Helmsderfer*, 527 F.3d at 1382. Indeed, IDT does not argue that the panel member and panel assembly constitute the same structure.  Ex. 2, Werner Dep., at 98:13-18.

Another possible interpretation is that the *panel assembly* has a separate edge from the edge of the *panel member*.  However, the '563 Patent never discloses a panel assembly with an "edge" that receives or directs light. Instead, the specification only describes an "edge of the

panel member." *See, e.g.*, Ex. 12, '563 Patent, at 9:15; Ex. 3, Gillespie Decl., ¶218.

A third possibility is that the claim contains an error and should have referred to the panel member rather than the panel assembly – *e.g.*, "said panel [***member***] having at least one light input surface for receiving light . . . and directing the light through said panel [***member***] from an edge of said panel [***member***] . . . ."  But, IDT is not arguing that there was an error in writing the claim. Ex. 2, Werner Dep., at 120:18-122:18. Moreover, the Court has no power to correct the claim where the precise error is not clear from the face of the patent and the meaning of the claim is subject to reasonable debate. *See Novo*, 350 F.3d at 1357-58.

IDT thus simply re-writes the claim by arguing that the plain meaning must be that the "edge of said panel assembly" is the same as the "light input edge of the panel member." *See* IDT Br., at 26; Ex. 2, Werner Dep., at 101:16-19. This is not what the claim says and the Court must interpret the claims as written.  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written, not as the patentees wish they had written it.")  As written, the claim does not provide reasonable certainty as to what constitutes the edge of the panel assembly.  Therefore, the claim is indefinite.

**9.  "one or more light emitting diodes along said light input surface for receiving light from said light emitting diodes and conducting the light from said edge for emission of the light from at least one of said sides."**

Claim 1 of the '956 Patent is indefinite. IDT asserts that this phrase should be given its plain meaning.  But, even IDT agrees that the plain meaning of the claim, as written, is nonsensical. There are only two ways to read the plain language of the claim.  The grammatically correct reading is that the light emitting diodes (LEDs) receive and conduct the light from the LEDs.  *See* Ex. 3, Gillespie Decl., ¶224.  IDT concedes that a person of ordinary skill in the art would understand that LEDs "emit light, they do not receive light." Ex. 3, Gillespie Decl., ¶224; IDT Br., at 29; Ex. 2, Werner Dep., at 125:6-12.  LEDs also do not conduct light.  Ex. 3,

Gillespie Decl., ¶224.  Accordingly, under this plain reading of the claim language, the claim is indefinite because it claims something that is not possible.  *See Synqor, Inc. v. Artesyn Techs., Inc.*, No. 2:07-cv-497-TJW-CE, 2010 WL 2991037, at *27-28 (E.D. Tex. July 26, 2010) (claim indefinite where subject to three possible interpretations, two of which unsupported by the specification and the third contradicts other claim limitations).

A second possible reading of the claim – although incorrect grammatically – is that the light input surface receives and conducts the light.  IDT once again acknowledges, however, that such a structure is not possible.  IDT Br., at 29.  As a person of skill in the art would know, and IDT's expert acknowledges, a surface is a two-dimensional boundary that cannot **conduct** light. Ex. 3, Gillespie Decl., ¶¶225-26; Ex. 2, Werner Dep., at 126:10-13.  Thus, this alternative plain meaning of the claim also requires a finding of indefiniteness.

Recognizing the "plain meaning" of the claim language is nonsensical and indefinite, IDT attempts to rewrite the claim by arguing for an interpretation that is inconsistent with the plain language.  According to IDT, the claim should be substantially rewritten to mean that "the light guide ~~said light input surface for~~ receiv~~inges~~ light at its input edge ~~from said light emitting diodes~~ and conduct~~ing~~s the light from ~~said~~ that edge ~~for emission of the light from at least one of said sides~~."  *See* IDT Br., at 29.  Although IDT undoubtedly wishes this is what had been claimed, the court must "construe the claim as written, not as the patentees wish they had written it."  *Chef Am.*, 358 F.3d at 1374; *see also Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) ("[A] court may not rewrite a claim even if giving a disputed claim its plain meaning would lead to a 'nonsensical result.'").  The portion of the claim at issue makes no reference at all to the light guide and IDT cannot simply read this structure into the claim. Clearly the language was intentional, since it was added by the applicants during prosecution to

overcome a rejection.  Ex. 13, IDTFH00001250.  Having chosen this language for its claims, IDT must live with this language.  As written, the claim does not convey the scope of the invention with reasonable certainty and is therefore indefinite.  *Synqor*, 2010 WL 2991037, at *28 ("None of these options are reasonable interpretations because they would either completely rewrite the claims by ignoring express language of the claims or would cover concepts and features where there is no such disclosure in the specification.").

### 10. "output distribution defined by a greater width component than height component"

Claims 1, 33, and 34 of the '660 Patent (Ex. 14) require light sources configured to produce light having an "output distribution defined by a greater width component than height component."  This phrase is indefinite because the patent lacks any disclosure as to where the "output distribution" is measured to determine whether it has a "greater width component."  For example, the '660 Patent provides no reasonable certainty as to whether the dimensions of the "output distribution" are measured (i) from each individual light source in isolation, (ii) at some other point within the panel assembly (e.g., following the transition area), (iii) from the output region of the panel assembly; or (iv) at each of the aforementioned locations.

The intrinsic record does not provide reasonable certainty as to the relevant "output distribution."  Outside of the claims themselves, the Abstract contains the only mention of "a light output distribution with a greater width component than height component."  The Abstract, however, does not clarify where the dimensions of the "output distribution" should be measured.  Nor does the Abstract (or any other part of the '660 Patent) identify which component of the "output distribution" is the "width component" and which is the "height component."  As such, both the location and geometry of the "output distribution" measurement lack reasonable certainty.  Ex. 3, Gillespie Decl., ¶¶208-209.

- 19 -

Likewise, the extrinsic record is bereft of any evidence that a person of skill in the art would know with reasonable certainty where the claimed "output distribution" must be measured. Mr. Smith-Gillespie has opined that there is no reasonable certainty as to "which part of the light emitting panel assembly the output distribution applies" and, in fact, "[t]he claim could be read to mean the output of the light emitting panel or perhaps the output of the plurality of light sources, or the output distribution in the transition region."  Ex. 3, Gillespie Decl., ¶209.  Mr. Werner's testimony also reflects this lack of certainty.  Mr. Werner first testified that the "output distribution" would be measured based on "the nature of the light source itself." Ex. 2, Werner Dep., at 57:1-6, 67:5-7. Later, however, Mr. Werner changed course and testified that you could also measure the dimensions of the "output distribution" after the light encounters reflective surfaces arranged around the light sources. Ex. 2, Werner Dep., 137:12-22.  IDT's opening brief further highlights this ambiguity.  IDT cites figure 2 of U.S. Patent No. 5,005,108 (the '108 patent) as an example of a light emitting panel that has a greater width than height component. IDT Br. at 23-24. Figure 2, however, depicts a panel member without light sources and IDT fails to identify where within the panel the "output distribution" would be measured.

Finally, IDT argues that "output distribution. . ." is definite because Mr. Smith-Gillespie testified it refers to "spatial uniformity." IDT Br. at 24. IDT misses the point; even if a person of ordinary skill in the art would generally understand "light output distribution," there is no reasonable certainty as to where in the panel assembly of claims 1, 33, and 34 the dimensions of that "output distribution" must have a greater width component than height component.

## III.   CLAIM TERMS IN DISPUTE

### A.  Terms to Construe

#### 1.  "continuous side walls"

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|

| "side walls free of discontinuities" | Plain meaning. |
|---|---|

Claims 1 and 15 of the '177 Patent recite "[a] light emitting assembly comprising a tray having a back wall and continuous side walls that form a hollow cavity or recess completely surrounded by the side walls." Ex. 8, '177 Patent, at 9:21-23; 10:11-13. Continuous, in the context of the claims, specification, and file history, clearly means "free of discontinuities."

Neither "continuous side walls" nor "continuous" appears in the text of the specification. But, Figure 6 tracks the claim language, showing a tray (35) with a cavity or recess (36) having continuous walls free of any discontinuities. *Id.* at 6:65-67. This is the only tray depicted.



The "continuous side walls" language was added to the claims in response to a rejection based on the "Kitazawa" prior art reference. *See* Ex. 15, at JD0002569-570. The examiner rejected claims 1 and 15 as anticipated by Kitazawa, asserting that it discloses a tray and the other claimed features. *Id.* To overcome this rejection, the applicant amended claims 1 and 15 to further limit the tray to one "having a back wall and continuous side walls that ~~forms~~ form a hollow cavity or recess completely surrounded by the side walls." Ex. 16, IDT0000278-287. And, the applicant argued, *inter alia*, that "the so-called tray 12 of Kitazawa does not have a back wall and continuous side walls that form a hollow cavity or recess completely surrounded by the side walls. . . ." *Id.* The applicant, thus, relied on the continuous side walls disclosed in Figure 6 of the specification, side walls free of discontinuities, to distinguish over the prior art.

Plaintiffs' "plain meaning" construction is problematic for this term. It is clear from Plaintiffs' infringement contentions that Plaintiffs intend to argue the plain meaning of

"continuous side walls" includes walls containing notches, openings, and other discontinuities. *See, e.g.*, Ex. 17, Plaintiffs' Infringement Contentions to BMW, at 5-6.   But such an interpretation is flatly inconsistent with what the patent discloses and what was argued during prosecution.   Because the parties disagree on the proper scope of "continuous side walls," a "plain meaning" construction will not suffice to aid the jury.   *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

In prior litigation, Judge Payne found "plain meaning" after rejecting the prior defendants' proposed construction, which they then conceded. Ex. 6, *Acer*, D.I. 101, at 17. While Judge Payne, in that case, disapproved of construing "continuous side walls" as "uninterrupted walls free of breaks,"  Defendants' proposed construction here hews more closely to the intrinsic record and will serve to avoid jury confusion resulting from Plaintiffs' expansive and erroneous interpretation of plain meaning.   Defendants' proposed construction merits a fresh review. *See Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-590 (E.D. Tex. 2002) (declining to adopt earlier claim constructions where "defendants have had no chance to litigate their claims").

## 2.   "transition region"

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| "an area to make the transition from the light source to the light emitting area of the panel member ['370] / optical conductor ['660]" | "a region configured to transmit light" |

As Plaintiffs explained in the *Acer* case, Defendants' construction "tracks the specification of the patents-in-suit" and does not "read improper limitations into the claims."  Ex. 18, *Acer*, D.I. 69, at 12.   Indeed, Defendants propose precisely the construction that Plaintiff proposed in the *Acer* case, yet Plaintiffs argue against that construction here.   *See id.* Notwithstanding Plaintiffs' inconsistent positions, Plaintiffs were correct in *Acer*, and

Defendants' construction here is correct.

"[T]ransition region" (or "transition area") is a term coined in the patents and understood in the field as referring to a region or area with a particular placement– *i.e.*, the area after the light source but before the light emitting region – and with a particular purpose – *i.e.*, "to constrain the light for injection into the light guide's emission zone."  Ex. 3, Gillespie Decl., ¶48. The specifications of both patents confirm that the transition region receives light from the light source and transmits that light to the light emitting portion.  *See, e.g.*, Ex. 7, '370 Patent, at 1:32-36. Exemplary transition areas (63, 12) are highlighted below in Figures 10[10] and 3.[11]



Defendants' construction tracks the specification and highlights that the transition region facilitates light transmission from the light source to the light emitting region.  Accordingly, Defendants' construction recognizes that "transition region" implicitly "describes something about the structure of the apparatus rather than merely listing its intended or preferred uses." *Textron Innovations Inc. v. Amer. Eurocopter Corp.*, 498 Fed. App'x 23, 28 (Fed. Cir. 2012) (functional language may be used to add limitations to an apparatus claim); *see also* Ex. 3, Gillespie Decl., ¶48.

Plaintiffs now change course and request this Court to adopt a construction from a prior

---

[10] Figure 10 of the '370 and '660 Patents shows a transition area (63) that receives light from the light sources (3), mixes the light, and then transmits the light into the light output area (62).  Ex. 7, '370 Patent, at 7:55-8:5; Ex. 14, '660 Patent, at 7:55-8:5.
[11] Figure 3 of the '370 and '660 Patents shows the transition area has a distinct interface with the light emitting portion: "transition areas 12" emit light "into the light input surface 19 of the light emitting panel 14." Ex. 7, '370 Patent, at 3:42-50; Ex. 14, '660 Patent, at 3:39-50.

case involving other defendants who proffered a different construction.  IDT Br., at 3; *see Mobile Telecomc'ns Techns., LLC v. Samsung Telecommc'ns Am., LLC*, C.A. No. 2:13-259-RSP, 2014 WL 6997767, at *2 (E.D. Tex. Dec. 11, 2014) (declining to adopt the Court's construction from a parallel case involving the same patents).  Defendants here were not in the prior suit and advocate a different position—one the Plaintiffs previously proffered.

The Court should not adopt the *Acer* construction—"region configured to transmit light"—because it is overbroad and omits the structure and function implicit in the term.  The prior construction encompasses ***any region*** in the light emitting assembly configured to transmit light, which is so broad it could encompass the light source and the light emitting portion of the light guide.  Defendants' construction appropriately differentiates between the light source, the transition region, and the light emitting portion according to the patent's disclosure.

### 3.  "an air gap between the film, sheet, plate or substrate and the panel member"

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| "the film, sheet, plate or substrate and the panel member are held apart and do not fit snugly together" | Plain and ordinary meaning |

The jury needs guidance as to the metes and bounds of the claimed "air gap." Plaintiffs asserted during the Prior Litigation's Claim Construction Hearing that it was "not arguing that a single molecule of oxygen between the two [sheets sitting on top of each other] constitutes an air gap." Ex. 19, D.I. 108,  at 66:1-8.[12] Without construction, the jury may be confused as to how much "air" is required to find that an "air gap" limitation is met. Defendants' proposed construction is taken directly from language used by patentee in the intrinsic record where the patentee repeatedly explained and used the "air gap" term. As shown in the specification of the '194 Patent, an adhesive applied only to the periphery of the surfaces creates contact on the

---

[12] Plaintiffs incorrectly presume Defendants are "using many of the same arguments that this Court has already rejected" Ex. 18, IDT Br., at 1. Defendants do not offer the same construction as proposed in the Prior Litigation.

periphery and holds the surfaces apart in the interior section. Ex. 4, '194 Patent, at 6:39-51. The

patent explains that where the surfaces are adhered only along the peripheral edges of the panel

surfaces, an air gap exists, whereas when the panel surfaces are fully adhered to one another no

air gap exists. This same principle is illustrated elsewhere in the specification where the patentee

explained: "[T]he light source is desirably embedded, potted or bonded to the light transition

area to eliminate any air gaps," (*id.* at 1:39-40) and "preferably the light sources 3 are embedded,

potted or bonded in the light transition areas in order to eliminate any air gaps." *Id.* at 3:60-62.

The patentee indicated that no air gap exists when two surfaces fully adhere to one another.

During prosecution of a related patent,[13] the applicant made clear when overcoming a

prior art reference that plates "held closely" together eliminate an air gap:



"**although an air gap is shown in these two figures**, as column 21, lines 1-11 of Ohtsuki [U.S. Patent 5,786,665] makes clear, the LED Lamps 70 and the block-shaped member 91 are pressed on the transparent gel layer 80 formed on the light surface 50a of the light directing plate 50 so as to be **held closely** in contact therewith to **eliminate an air layer** between the light directing plate 50 and the LED lamps. Thus there is no open gap between the light source and the transparent member for mixing of the light before passing through the transparent member."

Ex. 20,  at 10 (emphasis added). *See Omega Eng'g Inc. v Raytek Corp.*, 334 F.3d 1314, 1333-34

(Fed. Cir. 2003) (prosecution history of related patents relevant to limitations in common with

the asserted patent). Logically, as two surfaces "held closely" together eliminate an air gap, two

surfaces "held apart" may create an air gap.

Further support for Defendants' construction occurred during the prosecution of U.S.

Patent No. 6,755,547, another related patent. There the applicant addressed a rejection over U.S.

Patent No 6,129,439 (the "Hou" reference), arguing that no air gap existed between the light

---

[13] U.S. Patent No. 7,077,544, a division of U.S. Patent No. 6,712,481 an ancestor to the patents-in-suit.

emitting area of the light emitting member and a separate transparent sheet, despite apparent spaces between the micro prisms (28):

> The reflecting means 18 (including the spacer 82 that separates the micro lenses 80 and micro prisms 28) is optically coupled to the wave guide 16 (column 4, lines 14-17 and column 6, lines 61 and 62).  Thus there is no air gap in Hou et al between the light emitting area of a light emitting member and a separate transparent sheet of film as claimed.



Ex. 21, at IDT0000044. The passage cited, 4:14-17, states that "reflecting means 18 is in contact with wave guide 16." *See also* Ex. 22, Hou, at 4:18-24; 5:9-10.

Finally, in the prosecution of U. S. Patent No. 7,434,974, the applicant describes a prior art reference in which:

> the plate-like projecting portion 40 of the light conducting plate 39 of Sakuma [U.S. Patent No. 5,184,888] fits snugly into the opening 35 in the decorative panel 33 (column 5, lines 25-27, Fig. 7), and thus there is not [sic] air gap between the light emitting panel member and an additional component as recited in claim 18.

Ex. 23, at IDT0000567. Simultaneously, the patentee argued something that "holds [an] additional component away from the panel member" creates an air gap. *Id.* Thus, in a related patent, the patentee stated, unequivocally, there is no air gap when two things "fit snugly" together, while there is an air gap when two things are "held apart."  Plaintiffs want to ignore this prosecution history; however, the "air gap" term cannot mean one thing in the '974 Patent and something different in the related '194 Patent. *Omega Eng'g Inc.,* 334 F.3d at 1334. Defendants' proposed construction for the disputed "air gap" phrase is entirely consistent with the intrinsic record and, therefore, should be adopted.

**4. "one or more secondary flat, angled, faceted or curved reflective or refractive surfaces"**

- 26 -

| Defendants' Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| "reflective or refractive surfaces that reflect or refract a portion of the light around one or more corners or curves in a non-rectangular shaped tray" | Plain meaning. |

The term "secondary surface" has no accepted meaning in the art. Ex. 3, Gillespie Decl., ¶185-189. Instead, the inventor supplied his own definition for "secondary . . . surfaces" with reference to Figure 6 (shown below): "[O]ne or more secondary reflective or refractive surfaces 38 may be provided on the panel member 33 and/or the tray 35 *to reflect a portion of the light around one or more corners or curves in a non-rectangular shaped panel member 33*."  Ex. 8, '177 Patent, at 7:3-7 (emphasis added); *see Bell Atlantic Network Serv's, Inc. v. Covad Comm's Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("The specification acts as a dictionary 'when it expressly defines terms used in the claims or when it defines terms by implication'") (internal citation omitted).  In this embodiment, the light travels from the light sources 3 and reflects or refracts from the angled, secondary surface 38 <u>around a corner</u> to the light output area 34.  *Id.* at 7:3-12.  The red arrows in Figure 6 below indicate the light's path off a secondary surface.



**'177 Patent, Figure 6 (modified to include red arrows)**

The '177 Patent discloses no other embodiments including a secondary surface.  *See* Ex. 3, Gillespie Decl., ¶¶185-189 (distinguishing the "secondary . . . surfaces" from other reflective or refractive surfaces disclosed in the patent).

The "secondary . . . surfaces" are recited separately, and thus are necessarily distinct, from the "back, side edge, and end edge reflector[s]" disclosed in claims 1 and 15. Ex. 8, '177

Patent, claims 1, 15; *see* Ex. 3, Gillespie Decl., ¶¶86-87, 185-189. Moreover, the patent describes the role of the back and edge reflectors differently from the "secondary surfaces"—e.g., while back reflectors direct the light back through the opposite side of the panel member, the distinct purpose of the secondary surface is to reflect around one or more corners or curves. Ex. 3, Gillespie Decl., ¶¶185-189; Ex. 8, '177 Patent, at 6:18-29, 6:67-7:3, Fig. 5, Abstract ("The tray acts as a back, side or edge reflector, and has one or more secondary reflective or refractive surfaces."). Defendants' proposed construction appropriately distinguishes between the "secondary . . . surfaces" and other reflector elements.

Plaintiffs' "plain meaning" construction is untenable because Plaintiffs' understanding of "secondary surfaces" is overbroad.  It is clear from Plaintiffs' infringement contentions that Plaintiffs intend to argue "secondary reflective surfaces" includes "[a]ll surfaces of the tray that are not the back wall or continuous side walls."  *See, e.g.*, Ex. 17, Plaintiffs' Infringement Contentions to BMW, at 9.  But those contentions contradict the claims and the specification because, as noted above, "secondary . . . surfaces" (1) are distinct from "back, side edge, and end edge reflector[s]" and (2) must reflect or refract light around corners or curves in a non-rectangular tray.  It is apparent that the parties disagree on the scope of this term; thus, a construction is appropriate.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

### 5.  "predetermined"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Fixed |

Plaintiffs' construction of "predetermined" as "fixed" has no support in the claims themselves, specification, or prosecution history, which explains why Plaintiffs cite to *no intrinsic evidence* to support their proposal. Indeed, Plaintiffs cite to no evidence *at all*. Plaintiffs

cite only a construction in a previous matter—which is not evidence—in which the Court construed "predetermined" as "fixed," based on extrinsic evidence, *i.e.*, dictionary definitions. Ex. 6, *Acer*, D.I. 101, at 42.[14] Notably, Plaintiffs have not actually submitted whatever extrinsic dictionary definitions on which the Court previously relied. Though Plaintiffs approvingly cite the previous Court's reasoning that "fixed" imposed a "degree of immutability," Plaintiffs offer no explanation or evidence why a person of ordinary skill in the art would understand "predetermined" to require any particular degree of "immutability," or why the term "predetermined" itself is inadequate to communicate whatever degree of "immutability" the claims may require. Absent any evidence, intrinsic or otherwise, that "predetermined" means "fixed," the term's plain and ordinary meaning controls.

### 6. "for shining light through said panel member"

| Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|
| "designed to cause light to shine through the panel member" | Plain meaning |

Claim 5 of the '563 Patent (Ex. 12) recites "an other light source located directly behind said panel member *for shining light through said panel member* independently of the light emitted by said panel member from said light source."  Ex. 12, '563 Patent, claim 5 (emphasis added).  Defendants' construction clarifies that "for shining" is a recitation of the purpose of the other light source – *i.e.*, the other light source is "designed to cause" light to shine through the panel member.[15]

The specification very clearly describes the other light source and its purpose: "An

---

[14] Plaintiffs initially *agreed* that "predetermined" should be given its plain and ordinary meaning, only to change its mind at the *Markman* hearing based on the Court's suggestion to construe "predetermined" as "fixed." Ex. 24, *Acer*, D.I. 86, at 7.
[15] Defendants' construction is consistent with Webster's Dictionary, which defines "for" as "used as a function word to indicate purpose."  Ex.25, Webster's Ninth New Collegiate Dictionary (1991).

additional array of light sources 31 . . . may also be *strategically mounted* inwardly (i.e., behind) the inner surface of the light emitting panel members 29 and/or 30 *to cause a more intense light to shine through the panel members* . . . ."  Ex. 12, '563 Patent, at 9:21-26 (emphasis added). The specification also notes a panel member may have transparent areas at locations where the other light sources are "strategically mounted" to enable light to shine through the panel member at that particular location.  *Id.* at 9:27-29.  Thus, the other light sources in the specification are intended to shine light through the panel member, which is precisely what is claimed.

Plaintiffs criticize Defendants' construction for "introducing an element of intent that is speculative at best and irrelevant to the inquiry."  IDT Br., at 28.  IDT's argument highlights exactly why the Court should adopt Defendants' construction.  Defendants are not introducing an element of intent, rather the claim already includes it.  It is not enough that another light source exists, or that some *de minimis* portion of the light from the other source happens to shine through said panel member.  The claim requires that the purpose of the other light source is "for shining light through the panel member."  Only a light source that is designed to carry out this purpose can fall within the scope of the claim.  *See Acco Brands, Inc. v. Micro Security Devices, Inc.* 346 F.3d 1075, 1077-80 (Fed. Cir. 2003) (construing "for extending").

## IV.    CONCLUSION

For at least the reasons set forth above, Defendants respectfully request the Court to construe the terms or find the terms indefinite as described herein.

Dated: April 1, 2015                          Respectfully submitted,

| | |
|---|---|
| */s/ Cynthia J. Rigsby, with permission* | /s/ Scott W. Doyle |
| Jose L. Patino (Lead Attorney) | Scott W. Doyle |
| jpatino@foley.com | scott.doyle@shearman.com |
| Foley & Lardner LLP | Jonathan R. DeFosse |
| 3579 Valley Centre Drive | jonathan.defosse@shearman.com |
| Suite 300 | SHEARMAN & STERLING LLP |
| San Diego, CA 92130 | 801 Pennsylvania Ave., N.W. |
| Tel:  858-847-6875 | Washington, DC 20004 |
| | Tel: (202) 508-8000 |
| | Fax: (202) 508-8100 |
| Cynthia J. Rigsby | |
| crigsby@foley.com | |
| Foley & Lardner LLP | Michael E. Jones |
| 777 E. Wisconsin Ave. | State Bar No. 10929400 |
| Suite 3800 | mikejones@potterminton.com |
| Milwaukee, WI 53202 | |
| Tel:  414-297-5580 | POTTER MINTON P.C. |
| | 110 N. College Avenue, Suite 500 |
| | Tyler, Texas 75702 |
| Robert W. Weber | Telephone: (903) 597-8311 |
| Texas State Bar No. 21044800 | Facsimile: (903) 593-0846 |
| bweber@smithweber.com | |
| SMITH WEBER, L.L.P. | |
| 5505 Plaza Drive -- P.O. Box 6167 | ATTORNEY FOR DEFENDANTS |
| Texarkana, TX 75505-6167 | MERCEDES-BENZ U.S. |
| Tel:  903-223-5656 | INTERNATIONAL, INC. AND |
| | MERCEDES-BENZ USA, LLC |
| ATTORNEY FOR DEFENDANTS | |
| SPRINT SPECTRUM, L.P., SPRINT | |
| SOLUTIONS,INC., BOOST MOBILE, LLC, | |
| and VIRGIN MOBILE USA, L.P. | |

*/s/ Jamie B. Beaber*
Jamie B. Beaber
Hyunho "Harry" Park
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone:  (202) 263-3000
jbeaber@mayerbrown.com
harrypark@mayerbrown.com

Robert G. Pluta
Amanda K. Streff
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone:  (312) 701-8641
rpluta@mayerbrown.com
astreff@mayerbrown.com

Michael E. Jones
State Bar No. 10929400
mikejones@potterminton.com
Allen F. Gardner
State Bar No. 24043679
allengardner@potterminton.com

POTTER MINTON P.C.
110 N. College Avenue, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

ATTORNEYS FOR DEFENDANTS
HYUNDAI MOTOR COMPANY,
HYUNDAI MOTOR AMERICA,
HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC, KIA MOTORS
CORPORATION, KIA MOTORS
AMERICA, INC., KIA MOTORS
MANUFACTURING GEORGIA, INC.

|  | */s/ Brian Biddinger, with permission* |
|---|---|
|  | G.R. (Randy) Akin |
|  | Texas Bar No. 00954900 |
|  | G.R. (RANDY) AKIN, P.C. |
|  | 3400 W. Marshall Avenue, Ste. 300 |
|  | Longview, TX 75604 |
|  | Telephone:  (903) 297-8929 |
|  | Fax:  (903) 297-9046 |
|  | gra@randyakin.com |
|  |  |
|  | Jesse J. Jenner |
|  | NY Bar No. 1034776 |
|  | jesse.jenner@ropesgray.com |
|  | Brian P. Biddinger |
|  | NY Bar No. 4479382 |
|  | CA Bar No. 224604 |
|  | brian.biddinger@ropesgray.com |
|  | Matthew R. Shapiro |
|  | NY Bar No. 5102017 |
|  | matthew.shapiro@ropesgray.com |
|  | Alexandra O. Fellowes |
|  | NY Bar No. 5015946 |
|  | CA Bar No. 261929 |
|  | alexandra.fellowes@ropesgray.com |
|  | ROPES & GRAY LLP |
|  | 1211 Avenue of the Americas |
|  | New York, NY 10036 |
|  | Telephone: (212) 596-9000 |
|  | Facsimile: (212) 596-9090 |
|  |  |
|  | ATTORNEYS FOR DEFENDANTS |
|  | AMERICAN HONDA MOTOR CO., INC., |
|  | HONDA OF AMERICA MFG., INC., |
|  | HONDA MANUFACTURING OF |
|  | ALABAMA, LLC AND HONDA |
|  | MANUFACTURING OF INDIANA, LLC |

| | |
|---|---|
| */s/ Joseph P. Lavelle, with permission*<br>DC Bar No. 367011<br>Andrew N. Stein<br>D.C. Bar No. 1005411<br>**DLA PIPER LLP (US)**<br>500 Eighth Street, NW<br>Washington, DC 20004<br>Telephone: (202) 799-4000<br>Facsimile: (202) 799-5000<br>joe.lavelle@dlapiper.com<br>andrew.stein@dlapiper.com<br><br><br>ATTORNEYS FOR DEFENDANTS<br>BMW OF NORTH AMERICA, LLC AND<br>BMW MANUFACTURING CO., LLC | |

| | |
|---|---|
| */s/ Leslie H. Tronche, with permission*<br>Thomas W. Winland (admitted *pro hac vice*)<br>District of Columbia Bar No. 348508<br>**FINNEGAN, HENDERSON, FARABOW,**<br>**GARRETT & DUNNER, LLP**<br>901 New York Avenue N.W.<br>Washington, DC 20001<br>Phone: 202.408.4085<br>Fax: 202.408.4400<br>tom.winland@finnegan.com<br><br>Leslie Honey Tronche<br>State Bar No. 24078681<br>BECK REDDEN LLP<br>l22I McKinney St., Suite 4500<br>Houston, TX770l0<br>Phone 713.951.6246<br>Fax713.951.3720<br>www.beckredden,com<br>ltronche@beckredden.com<br><br><br>ATTORNEYS FOR DEFENDANTS<br>TOYOTA MOTOR CORPORATION,<br>TOYOTA MOTOR SALES, U.S.A., INC.,<br>TOYOTA MOTOR MANUFACTURING<br>KENTUCKY, INC., TOYOTA MOTOR<br>MANUFACTURING, INDIANA, INC.,<br>TOYOTA MANUFACTURING, TEXAS,<br>INC., TOYOTA MANUFACTURING,<br>MISSISSIPPI, INC., SUBARU OF<br>INDIANA AUTOMOTIVE, INC. AND<br>GULF STATES TOYOTA, INC. | */s/ Jeffrey S. Patterson, with permission*<br>JEFFREY S. PATTERSON, LEAD<br>COUNSEL<br>State Bar No. 15596700<br>jpatterson@hdbdlaw.com<br>JEFFREY J. COX<br>State Bar No. 04947530<br>jcox@hdbdlaw.com<br>SEAN N. HSU<br>State Bar No. 24056952<br>shsu@hdbdlaw.com<br>HARTLINE DACUS BARGER DREYER<br>LLP<br>8750 N. Central Expressway, Suite 1600<br>Dallas, Texas 75231<br>(214) 369-2100<br>(214) 369-2118 (fax)<br><br><br>ATTORNEYS FOR DEFENDANTS<br>NISSAN NORTH AMERICA, INC. AND<br>NISSAN MOTOR CO., LTD. |

*/s/ Michael J. Lennon with permission*
Deron R. Dacus
Texas State Bar No. 00790553
THE DACUS FIRM, P.C.
821 ESE Loop 323
Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile: (903) 7051117
Email: ddacus@dacusfirm.com

Michael J. Lennon (admitted pro hac vice)
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
Telephone: (212) 425-7200
Facsimile: (212) 425-5288
Email: mlennon@kenyon.com

Susan A. Smith (admitted pro hac vice)
KENYON & KENYON LLP
1500 K Street, N.W.
Washington D.C. 20005
Telephone: (202) 220-4200
Facsimile: (202) 220-4201
Email: ssmith@kenyon.com

Attorneys for Defendants and Counterclaim-
Plaintiffs VOLKSWAGEN GROUP OF
AMERICA, INC. and VOLKSWAGEN
GROUP OF AMERICA CHATTANOOGA
OPERATIONS, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 1, 2015.

*/s/ Jamie B. Beaber*